251 F.3d 219 (D.C. Cir. 2001)
 Pharmaceutical Research and Manufacturers of America, Appellant
v.
Tommy G. Thompson, in his official capacity as Secretary, United States Department of Health and Human Services, et al., Appellees
 No. 01-5029
 United States Court of Appeals FOR THE DISTRICT OF COLUMBIA CIRCUIT
 Argued April 10, 2001
Decided June 8, 2001
 
 Appeal from the United States District Court for the District of Columbia (No. 00cv02990)
 Allen R. Snyder argued the cause for appellant. With him on the briefs were Darrel J. Grinstead and Jeffrey Pariser.
 Ronald A. Shems argued the cause for appellee State of Vermont Agency of Human Services. With him on the brief were Susan R. Harritt and Rebecca Ellis, Assistant Attorneys General, State of Vermont.
 Scott R. McIntosh, Attorney, U.S. Department of Justice, argued the cause for the federal appellees. With him on the brief were Wilma A. Lewis, U.S. Attorney at the time the brief was filed, and Barbara C. Biddle, Attorney.
 G. Steven Rowe, Attorney General, and Paul Stern, Deputy Attorney General, State of Maine, were on the brief for amicus curiae State of Maine in support of appellee.
 Before: Sentelle, Rogers and Tatel, Circuit Judges.
 Opinion for the Court filed by Circuit Judge Tatel.
 Tatel, Circuit Judge:
 
 
 1
 The Medicaid statute requires pharmaceutical manufacturers to rebate a portion of the price of their drugs as a condition for participating in Medicaid. In this case, pharmaceutical manufacturers challenge the Department of Health and Human Service's approval of a Vermont demonstration project requiring the manufacturers to rebate a portion of the price of drugs purchased directly by certain individuals who are not otherwise covered by the state's Medicaid program. Because Congress imposed the rebate requirement in order to reduce the cost of the Medicaid program, and because no Medicaid funds are expended under the Vermont demonstration project and thus no Medicaid savings produced by the required rebates, we conclude that the Department lacked authority to approve the project. We therefore reverse the district court's decision to the contrary and remand for further proceedings.
 
 
 2
 * Funded jointly by the federal government and the states, Medicaid pays medical expenses for low-income people. Medicaid services are provided pursuant to plans developed by the states and approved by the Secretary of Health and Human Services. 42 U.S.C. 1396a(a)-(b). States pay doctors, hospitals, pharmacies, and other providers of medical goods and services according to established rates. The federal government then pays each state a statutorily established share of "the total amount expended ... as medical assistance under the State plan." Id. 1396b(a)(1). Medicaid beneficiaries cannot be required to contribute more than a "nominal" amount toward the cost of the benefits they receive. Id. 1396o.
 
 
 3
 Pharmaceutical manufacturers participating in Medicaid rebate to the states a portion of the price of drugs purchased for Medicaid purposes. Manufacturers do this because the Medicaid statute, id. 1396-1396u, permits the federal government to reimburse states only for drugs purchased from manufacturers who have agreed to pay statutorily specified rebates. Id. 1396r-8(a)(1). Rebates equal the number of units of a drug provided by a state's Medicaid program times the greater of (1) the difference between the average price of the drug and the lowest price its manufacturer gives any wholesaler, provider, health maintenance organization, nonprofit, or governmental entity, or (2) 15.1 percent of the average manufacturer price. See id. 1396r-8(c)(1). If the average price of a manufacturer's drug has increased faster than the consumer price index, the manufacturer must pay an additional rebate for each unit of the drug equal to the difference between the average price of the drug and the price of the drug on July 1, 1990 (or the day the drug first entered the market) adjusted to the consumer price index. Id. 1396r-8(c)(2). So calculated, rebates ensure that states get at least the best prevailing wholesale price--and possibly even a much better price--for drugs they purchase for Medicaid beneficiaries. In language central to this case, section 1396r-8 provides that rebate agreements shall require manufacturers to pay rebates on drugs for which "payment was made under the State plan." Id. 1396r-8(b)(1)(A).
 
 
 4
 The Social Security Act, of which the Medicaid statute is a part, authorizes HHS to approve experimental "pilot" or "demonstration" projects that the Secretary determines are "likely to assist in promoting the objectives of [Medicaid]." Id. 1315(a). Although the Act authorizes the Secretary to waive certain Medicaid requirements for such demonstration projects, it does not authorize him to waive any requirements of section 1396r-8's rebate provision or the requirement that Medicaid beneficiaries contribute no more than a "nominal" amount to the cost of medical benefits they receive. See id. 1315(a)(1).
 
 
 5
 For several years, Vermont has administered demonstration projects that extend pharmaceutical benefits to classes of individuals not otherwise covered by Medicaid. By letter dated March 17, 2000, Vermont sought HHS approval to "extend the Medicaid ... rebate structure" to nearly 70,000 new demonstration project beneficiaries, thus requiring pharmaceutical manufacturers to pay rebates on drugs purchased by this group. Known as the Pharmacy Discount Program, or "PDP," the expanded services would be funded as follows: Pharmacies would charge new beneficiaries the Medicaid price of a given drug minus the estimated average rebate Vermont receives for all drugs (approximately eighteen percent in 2000). Vermont would pay the pharmacies the eighteen percent and then bill manufacturers for that amount. As a result, PDP benefits would be paid not with funds appropriated by Congress and the states for Medicaid services, but by beneficiaries (eighty-two percent) and drug manufacturers (eighteen percent). By letter dated November 3, 2000, HHS approved the PDP.
 
 
 6
 Appellant, the Pharmaceutical Research and Manufacturers of America, whose members have entered into Medicaid rebate agreements and so would be required to pay rebates under the PDP, filed suit in the United States District Court for the District of Columbia claiming that the program violated two provisions of the Medicaid statute. First, the manufacturers argued that because the federal government and Vermont pay nothing under the PDP, the program violates the provision under which pharmaceutical manufacturers owe rebates only for drugs "for which payment was made under the State plan." Id. 1396r-8(b)(1)(A). Second, pointing out that program beneficiaries would pay for approximately eighty-two percent of the price of their prescriptions, the manufacturers argued that the PDP violates the requirement that states charge Medicaid beneficiaries no more than a "nominal" amount. Id. 1396o. Seeking a preliminary injunction, the manufacturers argued that if they refused to make payments under the PDP, HHS could terminate their eligibility to participate in the entire Medicaid program, but if they made such payments, Vermont's sovereign immunity would preclude them from recovering their money should they ultimately prevail in the litigation.
 
 
 7
 The HHS Secretary, along with the Secretary of Vermont's Agency of Human Services, who intervened as a defendant, responded that "payment" means payment, and that even though Vermont is reimbursed by manufacturers, it has still made a payment under the ordinary understanding of that word. As to the manufacturers' nominal copayment claim, the HHS Secretary argued that the manufacturers lacked standing to represent the interests of PDP beneficiaries. The Secretary did not deny that manufacturers refusing to make PDP rebate payments risked losing Medicaid eligibility nationwide, nor did the Vermont Secretary deny that sovereign immunity would bar recovery of any rebates paid.
 
 
 8
 On January 17, 2001, sixteen days after Vermont began implementing the PDP, the district court, concluding that the manufacturers were unlikely to succeed on the merits, denied their request for a preliminary injunction. Pharm. Research & Mfrs. of Am. v. United States, No. 2000-2990 (D.D.C. Jan. 17, 2001) (order denying preliminary injunction); see also Pharm. Research & Mfrs. of Am. v. United States, 135 F. Supp. 2d 1 (D.D.C. 2001). Renewing the arguments they made in the district court, the manufacturers appeal.
 
 II
 
 9
 According to the Vermont Secretary of Human Services, "[p]rescription drug prices can place an enormous burden on working Vermonters." Intervenor's Br. at 58. "The uninsured and under-insured," she explains, "are often unable to obtain drugs because of the high cost.... Without the assistance of the PDP, these individuals might forego obtaining these medicines, reduce the amount or frequency of their prescriptions for financial reasons, or elect to obtain medicines by sacrificing other necessities." Id. (internal quotation omitted). Our task, however, is neither to evaluate the PDP's policy justification nor to determine whether the program best serves the pharmaceutical needs of the poor. Cf. Robert Pear, States Creating Plans to Reduce Costs for Drugs, N.Y. Times, Apr. 23, 2001, at A1 (describing various state programs to help low-income elderly people buy prescription drugs). We face a straightforward legal issue: Did the Department exceed its statutory authority by authorizing Vermont to require pharmaceutical manufacturers to make rebates under the PDP?
 
 
 10
 The manufacturers argue that the Department lacked authority to approve the PDP because, as they interpret the statute, the payments Vermont makes to pharmacies are not "payment[s] ... made under the State plan." As they see it, Vermont merely acts as a conduit for money received from drug manufacturers, which could not possibly be what Congress meant by "payment":
 
 
 11
 [T]he only plausible reading of the "payment" requirement is that the State must make an actual outlay of funds.... Had Congress wanted Medicaid rebates to be triggered by loans, pass-throughs, or individual beneficiaries' outlays, it would have said as much. The Act cannot reasonably be interpreted such that the only "payment ... under a state plan" necessary to justify a manufacturer rebate is the manufacturer rebate itself.
 
 
 12
 Appellant's Opening Br. at 22. The HHS Secretary responds that Vermont does make payments: it pays approximately eighteen percent of the price of drugs purchased by PDP beneficiaries. Citing a dictionary, the Secretary argues that "[t]o say that Vermont is not making a 'payment' to pharmacies when it pays them for the drugs they dispense to PDP participants is to abandon any ordinary understanding of the meaning of 'payment.' " Appellees' Br. at 24. The fact that Vermont gets reimbursed, the Secretary asserts, does not mean that Vermont's outlays of funds are not payments: "if an automobile owner pays a garage to repair the owner's car, the owner has made a payment to the garage; if the owner later receives a check from his insurance company that covers the cost of the repairs, it hardly follows that he no longer has made any payment." Id. at 25.
 
 
 13
 To resolve this debate, we proceed in accordance with Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., asking first "whether Congress has directly spoken to the precise question at issue." 467 U.S. 837, 842 (1984). If it has, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842-43. If we find the statute either silent or ambiguous with respect to the precise question at issue, we proceed to the second step of Chevron analysis, asking "whether the agency's answer is based on a permissible construction of the statute." Id. at 843. At this stage of Chevron review, we afford substantial deference to the agency's interpretation of statutory language. Id. at 844. Of course, not all agency interpretations of statutes warrant Chevron deference. See Christensen v. Harris County, 120 S.Ct. 1655, 1662 (2000) ("Interpretations such as those in opinion letters--like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law--do not warrant Chevron-style deference.") (internal citations omitted). In this case, however, we need not decide whether the Department's approval of the PDP would be entitled to Chevron deference, for using traditional tools of statutory interpretation--text, structure, purpose, and legislative history, see Bell Atl. Tel. Cos. v. FCC, 131 F.3d 1044, 1047 (D.C. Cir. 1997)--we conclude that Congress has "directly spoken to the precise question at issue"; that is, whether "payment" includes expenditures that are fully reimbursed by manufacturer rebates.
 
 
 14
 We agree with the Secretary that our inquiry begins with the words of the statute. But a word's "ordinary understanding" is not always controlling. Words draw meaning from context. Consider Article III, Section 1 of the Constitution: "Judges ... shall hold their Offices during good Behaviour." Although the dictionary includes "conformity with ... the norms of good manners or social decorum" among its definitions of "behavior," Webster's Third New International Dictionary 199 (1993), no one would suggest that judges be removed for failing to observe Emily Post's standards of etiquette--the use of "behaviour" in the context of judges' qualifications for office rules out such an interpretation. Indeed, just last week the Supreme Court emphasized that statutory terms can have a narrower meaning in context than the same words have in common usage. See Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res., U.S., 121 S.Ct. 1835, L.Ed.2d (2001) (interpreting the word "prevailing" in the statutory term "prevailing party" to have a narrower meaning than it has in Webster's); cf. K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 319 (1988) (Scalia, J., concurring in part and dissenting in part) ("While looking up the separate word 'foreign' in a dictionary might produce the reading the majority suggests, that approach would also interpret the phrase 'I have a foreign object in my eye' as referring, perhaps, to something from Italy.").
 
 
 15
 So too here. Although as the Secretary's car repair example illustrates, the word "payment" is broad enough to include reimbursed expenditures, consideration of the word's context--the statute's purpose and legislative history--reveals a far narrower meaning. Properly understood, "payment" here means only payments with state or federal funds appropriated for Medicaid expenditures; absent such payments, pharmaceutical rebates would not contribute to reducing the cost of the taxpayer-funded Medicaid program, and the legislative history makes quite clear that Congress's purpose in requiring rebates was to do just that. Senator Pryor, sponsor of the rebate provision, explained in his statement introducing the bill that rebates are designed to stop pharmaceutical manufacturers from "bankrupting the coffers of the State Medicaid drug programs." 136 Cong. Rec. 24,145 (1990). The provision "requires drug manufacturers to offer substantial discounted prices to the Medicaid Program ... [b]ecause there is no logical reason why, in an era of severe budget constraints and social needs, the Medicaid Program should be denied access to [the] same generous discounts" hospitals and HMOs receive. Id. Rebates, the Senator estimated, would "achieve in excess of $2.5 billion in savings" over five years. Id.
 
 
 16
 The House Report on the bill likewise demonstrates that Congress required rebates in order to reduce Medicaid expenditures: "[T]he bill is framed to achieve significant Medicaid savings...." H.R. Rep. No. 101-881, at 98 (1990). Responding to projections that federal Medicaid payments for prescription drugs would reach $2.8 billion in 1991, the House Report declared that "Medicaid, the means-tested entitlement program that purchases basic health care for the poor, should have the benefit of the same discounts on single source drugs that other large public and private purchasers enjoy." Id. at 96.U.S.Code Cong. & Admin. News 1990, at 2108.
 
 
 17
 This legislative history demonstrates that Congress imposed the rebate requirement for two overlapping reasons: to reduce the cost of Medicaid and to prevent pharmaceutical manufacturers from charging the government and taxpayers above-market prices for Medicaid drugs. Understood within this context, "payment" excludes situations where no government funds are spent; otherwise, manufacturers could be required to pay rebates that neither "achieve significant Medicaid savings" nor prevent pharmaceutical companies from "bankrupting the coffers of the State Medicaid drug programs." Because Vermont's PDP payments are fully reimbursed by manufacturer rebates, and because the rebates produce no savings for the Medicaid program, the state's payments to pharmacies are not "payments" within the meaning of the statute.
 
 
 18
 An additional feature of the Medicaid statute reinforces our view that when Congress said "payment," it meant payment with funds appropriated for Medicaid purposes. Section 1396r-8(a)(4) provides that if a state had a rebate agreement with a manufacturer before the federal rebate requirement took effect, that agreement would "be considered to be ... in compliance" with the Medicaid statute if "such agreement provide[d] for a minimum aggregate rebate of 10 percent of the State's total expenditures under the State plan for coverage of the manufacturer's drugs." 42 U.S.C. 1396r-8(a)(4). This provision makes sense only if a state's expenditures for drugs are determined by the price of the drugs, not by the amount of expected rebates. If, as in the PDP, the amount of a state's expenditures were determined by the size of the rebates the state expected, section 1396r-8(a)(4)'s minimum would be entirely circular--it would require the rebate to be at least ten percent of the state's expenditures, and those expenditures would be equal to the rebate, suggesting that the rebate would have to be at least ten percent of itself. This provision, in other words, does not contemplate that expenditures would be set at the amount of the rebates a state receives; rather, it assumes a net expenditure of funds appropriated for Medicaid purposes in an amount determined independently of the amount of the rebates.
 
 
 19
 The HHS Secretary argues that even if the PDP involves no "payment[s]" within the meaning of the statute, Congress gave the Department, as part of the power to approve demonstration projects, authority to regard "costs of such project[s] which would not otherwise be included as expenditures ... as expenditures under the State plan." Id. 1315(a)(2)(A) (emphasis added). Yet in its March 17 letter seeking approval of the PDP, Vermont assured the Department that "there will be no ... cost to the program." Because manufacturer rebates reimburse Vermont for all PDP payments, the only cost the state arguably incurs is "forgone interest" from "the significant delay between the time that Vermont pays pharmacies and the time that it receives corresponding rebates." Appellees' Br. at 25; Pharm. Research & Mfrs. of Am., 135 F. Supp. 2d at 14 ("[T]he state could have earned interest on the funds if they were collected from taxpayers but not advanced to the pharmacies on behalf of the manufacturers."). Even assuming the Department may regard the cost of foregone interest as an expenditure or payment, however, here it is not a payment for pharmaceuticals. Under the PDP, Vermont makes payments to pharmacies and incurs the interest cost in order to trigger the rebate requirement. Put another way, Vermont's foregone interest cost is the cost of extending the manufacturers' rebate obligations to drug purchases made by individuals not otherwise covered by the state's Medicaid program. Yet the statute requires rebates only for "drugs ... for which payment was made under the State plan." 42 U.S.C. 1396r-8(b)(1)(A) (emphasis added). The Department has no statutory authority to treat the cost of providing rebate benefits to non-Medicaid Vermonters as payment for outpatient drugs.
 
 
 20
 Perhaps Congress could require manufacturers to pay rebates when no funds appropriated for Medicaid purposes were actually expended. Perhaps Congress could authorize HHS to accomplish directly what it has done indirectly through the PDP--require pharmaceutical manufacturers to provide substantial discounts to individuals not otherwise covered by state Medicaid programs. But because it has done neither, and because Vermont makes no "payments" within the meaning of section 1396r-8, the Department lacked authority to approve the PDP.
 
 
 21
 In reaching this conclusion, we recognize that nothing in the statute's language or legislative history suggests that Congress considered the possibility of requiring rebates where no Medicaid funds are expended. But because we think it so obvious that Congress's purpose in requiring manufacturer rebates was to reduce the cost of the Medicaid program, we think that Congress's silence cannot provide a basis for allowing the Department to extend the rebate requirement to situations where, as here, rebates produce no Medicaid savings. Determining how to fund pharmaceutical benefits for the poor and whether their cost should be shared by pharmaceutical manufacturers is a responsibility that, absent express congressional direction to the contrary, must be left to Congress.
 
 III
 
 22
 Having no need to consider the manufacturers' alternative argument that the PDP also runs afoul of the statute's "nominal" copayment requirement, we reverse the decision of the district court and remand for further proceedings consistent with this opinion.
 
 
 23
 So ordered.