TRIPOLI ROCKETRY ASSOCIATION, INC., et al., Plaintiffs,

v.

UNITED STATES BUREAU OF AL-COHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, Defendant.

No. CIV.A.00–273 RBW.

United States District Court, District of Columbia.

March 19, 2004.

Martin G. Malsch, Egan & Associates, McLean, VA, for Plaintiffs.

U.S. Attorney's Office, Washington, DC, for Defendant.

### MEMORANDUM OPINION

WALTON, District Judge.

This matter comes before the Court upon the parties' cross-motions for summary judgment, following the issuance of this Court's June 21, 2002 Memorandum Opinion.[1] In this case, the plaintiffs, Tripoli Rocketry Association, Inc. ("Tripoli") and the National Association of Rocketry ("NAR"), are challenging the defendant Bureau of Alcohol, Tobacco, Firearms and Explosives's ("ATF")[2] decisions: (1) to classify ammonium perchlorate composite propellant ("APCP") as an explosive (Count One of the First Amended Complaint); (2) to deny sport rocket motors an exemption for propellant actuated devices ("PADs") (Count Three of the First Amended Complaint); and (3) "to establish thresholds for [the] regulation of certain APCP rocket motors based upon their weight, design, or intended use without first affording the public an opportunity to comment upon such thresholds" (Counts Four and Five of the First Amended Complaint). Plaintiffs' Motion for Summary Judgment ("Pls.' Mot."), Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Summary Judgment ("Pls.' Mem.") at 7 (citing First Amended Complaint ("Am.Compl.") at ¶¶ 38–41, 45–47, 48–53). Upon consideration of the parties' submissions and for the following reasons, the Court will grant summary judgment to the defendant on the issue of whether APCP is an explosive, will grant summary judgment to the plaintiff on the validity of the ATF's pronouncement that sport rocket motors are not PADs because this pronouncement fails to comply with notice-and-comment rulemaking, and will stay a ruling on counts four and five pending the completion of previously initiated notice-and-comment rulemaking.

### I. Standard of Review

The plaintiffs' claims were brought under the Administrative Procedure Act ("APA") and therefore 5 U.S.C. § 706 contains the applicable standard of review. Section 706 states:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—

---

1. The factual background of this case is set forth in the Court's June 21, 2002 Memorandum Opinion.

2. The Bureau of Alcohol, Tobacco and Firearms recently became the Bureau of Alcohol, Tobacco, Firearms and Explosives and "move[d] its explosives regulations function from the Treasury Department to the Justice Department under the new Homeland Security Act, Pub.L. 107–296[.]" Defendant's Notice of the Passage of the Safe Explosives Act of 2002 at 2.

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

## II. *Legal Analysis*

### (A) *Is the ATF's Classification of APCP as an Explosive under the Organized Crime Control Act Valid?*

■ The ATF is charged with enforcing Title XI of the Organized Crime Control Act of 1970 ("OCCA" or the "Act"), which regulates the importation, manufacture, distribution, and storage of explosive materials. *See* 18 U.S.C. § 841 *et seq.* Section 841(d) of Title 18 of the United States Code defines "explosives" as

any chemical compound mixture, or device, the *primary or common purpose of which is to function by explosion;* the term includes, but is not limited to, dynamite and other high explosives, black powder, pellet powder, initiating explosives, detonators, safety fuses, squibs, detonating cord, igniter cord, and igniters.[3]

18 U.S.C. § 841(d) (emphasis added). The OCCA also states that the "Attorney General shall publish and revise at least annually in the Federal Register a list of these and any additional explosives which he determines to be within the coverage of this chapter." *Id.* On January 15, 1971, pursuant to this subsection, APCP was placed on the first List of Explosive Materials, *see* 36 Fed.Reg. 675 (Jan. 15, 1971), and has remained on the list ever since, *see* 67 Fed.Reg. 20864 (Apr. 26, 2002). The plaintiffs brought suit following receipt of a December 22, 2000 letter from the ATF to the plaintiffs' counsel reiterating the agency's position that the:

(i) ATF had properly classified APCP as an explosive; (ii) ATF had properly included APCP on its annual explosives list and such inclusion did not require notice and comment rulemaking; (iii) ATF cannot classify sports rocket motors as a propellant actuated device, and thus sports rockets motors are not exempt from ATF regulation; and (iv) ATF properly decided to exempt sports rocket motors containing 62.5 grams (or less) of propellant.

*Tripoli Rocketry Assoc. v. United States Bureau of Alcohol, Tobacco and Firearms,* Civ. A. No. 00-273, at 5 (D.D.C. June 21, 2002) (citing Am. Compl. ¶ 34); *see* Administrative Record ("A.R.") 1 (December 22, 2000 letter from the ATF's Assistant Director of Firearms, Explosives and Arson to plaintiffs' counsel).

The ATF takes the position that the statutory definition of explosives "makes it clear that an item can 'function by explosion' either by detonating or by deflagrating." Defendant's Renewed Motion for

---

**3.** The Court notes that § 841(d)'s definition of "explosives" does not apply to subsection (d), (e), (f), (g), (h), (i), and (j) of 18 U.S.C. § 844, which are the criminal provisions of the Organized Crime Control Act. *See* 18 U.S.C. § 841(d). Instead, 18 U.S.C. § 844(j) provides a separate definition of "explosives" for the criminal provisions of the Act. The plaintiffs do not challenge the ATF's interpretation of § 844(j). Am. Compl. ¶ 16.

Summary Judgment ("Def's.Mot."), Defendant's Memorandum of Points and Authorities in Support of Renewed Motion for Summary Judgment ("Def's.Mem.") at 9–10; *see* A.R. 1 at 2. The defendant asserts that this is because Congress specifically included items in § 841(d)'s definition of "explosives" that are only designed to deflagrate, rather than detonate, such as black powder, pellet powder, safety fuses, and igniters. Def.'s Mem. at 9–10; A.R. 1 at 3–4. Therefore, the ATF concludes that this Court should "give effect, as did ATF, to Congress's unambiguously expressed intention that deflagrating materials be classified as explosives" because "even though the statutory definition of explosives found at 18 U.S.C. § 841(d) does not specifically refer to APCP in particular as an 'explosive' the definition renders it beyond question that deflagrating propellants such as APCP should be classified as explosives." Def.'s Mem. at 11 (citing *Chevron U.S.A. v. Natural Res. Def. Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). The plaintiffs, on the other hand, take the position that Congress did not mean to include a "chemical compound mixture, or device" that deflagrates when ignited in § 841(d)'s definition of an "explosive[,]" Pls.' Mem. at 9–14, and even if a "chemical compound mixture, or device" that deflagrates is included within this definition, APCP merely burns when ignited, rather than deflagrating, *id.* at 15–18.

Applying the familiar *Chevron* test, the Court must first determine "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." 467 U.S. at 842–43. If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778. In *Barnhart v. Walton,* 535 U.S. 212, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002), the Supreme Court recently summarized the *Chevron* inquiry by stating that a court must decide "(1) whether the statute unambiguously forbids the Agency's interpretation, and, if not, (2) whether the interpretation, for other reasons, exceeds the bounds of the permissible." 535 U.S. at 218, 122 S.Ct. 1265 (citing *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778; *United States v. Mead Corp.,* 533 U.S. 218, 227, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001)). And, in making such an assessment, "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer[.]" *Chevron,* 467 U.S. at 844, 104 S.Ct. 2778. This is because "[c]ourts defer to agency interpretations in large part because Congress has chosen to delegate to the agency decisionmaking in the field." *Amerada Hess Pipeline Corp. v. FERC,* 117 F.3d 596, 601 (D.C.Cir.1997) (citing *Chevron,* 467 U.S. at 865–66, 104 S.Ct. 2778); *see Sec'y of Labor, Mine Safety and Health Admin. v. Excel Mining, LLC,* 334 F.3d 1, 7 (D.C.Cir.2003); *Paralyzed Veterans of Am. v. D.C. Arena LP,* 117 F.3d 579, 585 (D.C.Cir.1997). The *Chevron* Court explained that

> the principle of deference to administrative interpretations[ ] has been consistently followed by this Court whenever a decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations.

467 U.S. at 844, 104 S.Ct. 2778 (internal quotation omitted). Thus, if the agency's "choice represents a reasonable accommo-

dation of conflicting policies that were committed to the agency's care by the statute, [a court] should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *Id.* at 845, 104 S.Ct. 2778.

However, in *Mead,* the Supreme Court noted that "[t]he fair measure of deference to an agency administering its own statute has been understood to vary with circumstances[.]" 533 U.S. at 228, 121 S.Ct. 2164. The *Mead* Court recognized that even agency interpretations "beyond the *Chevron* pale" may be accorded some deference, as "Chevron did nothing to eliminate [the Supreme Court's holding in *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944) ] that an agency's interpretation may merit some deference whatever its form, given the 'specialized experience and broader investigations and information' available to the agency, and given the value of uniformity in its administrative and judicial understandings of what a national law requires[.]" *Mead,* 533 U.S. at 234, 121 S.Ct. 2164 (internal citations omitted).

To resolve the question of whether the ATF's classification of APCP as an explosive under the OCCA is statutorily permitted, this Court must first determine whether the ATF's interpretation of the definition of an explosive under § 841(d) of the Act to include items that deflagrate is permissible, and, if so, whether the ATF's decision that APCP is such an item is also permissible.

### (1) *Is the ATF's Determination that Materials that Deflagrate are Explosives for Purposes of the Organized Crime Control Act Valid?*

It is undisputed that Congress delegated the power to the Attorney General to "publish ... a list of ... explosives which he determines to be within the coverage of [the Organized Crime Control Act]." 18 U.S.C. § 841(d). At issue, however, is what Congress meant by the term "explosives" when enacting the OCCA. The Act defines "explosives" as

any chemical compound mixture, or device, the primary or common purpose of which is to function by explosion; the term includes, but is not limited to, dynamite and other high explosives, black powder, pellet powder, initiating explosives, detonators, safety fuses, squibs, detonating cord, igniter cord, and igniters.

18 U.S.C. § 841(d). However, Congress did not, nor did it desire to provide an all-inclusive list. Rather, it delegated the power to the Attorney General to list "additional explosives[.]" *Id.*

In *New York State Bar Association v. FTC,* 276 F.Supp.2d 110 (D.D.C.2003), this Court recently stated that the first step of the Chevron analysis requires a court to "use 'traditional tools of statutory interpretation-text, structure, purpose, and legislative history.'" *Id.* at 117 (quoting *Citizens Coal Council v. Norton,* 330 F.3d 478, 481 (D.C.Cir.2003)) (quoting *Pharm. Research & Mfrs. of Am. v. Thompson,* 251 F.3d 219, 224 (D.C.Cir.2001)). In *New York State Bar,* this Court began its analysis with the text of the statute, as the "first traditional tool of statutory construction focuses on the language of the statute[.]" *Id.* (quoting *Bell Atlantic Telephone v. FCC,* 131 F.3d 1044, 1047 (D.C.Cir.1997)).

Focusing on what Congress meant when it used the phrase "function by explosion" in its definition of an "explosive" under the OCCA, the Court first examines the plain meaning of what an "explosive" is and how that interpretation relates to deflagration While the OCCA was enacted over thirty years ago, the ATF has provided convincing evidence that deflagration was consid-

ered at that time as a form of an explosion. The *Encyclopedia of Explosives and Related Items* defines deflagration as

> *a mode of explosion* distinguished from detonation and constituting the very rapid autocombustion of particles of explosive as a surface phenomenon. In the case of deflagration, the reaction products flow away from the unreacted material, while in detonation these are at extremely high pressure and flow toward the unreacted material.

Basil T. Fedoroff & Oliver E. Sheffield, *Encyclopedia of Explosives and Related Items*, PATR 2700, Volume 3, (Picatinny Arsenal 1966) (Administrative Record ("A.R.") 8 at D 38) (emphasis added).[4] Thus, when the OCCA was enacted in 1970 deflagration and detonation were recognized as forms of explosions. Accordingly, because this Court is unable to find that the "statute unambiguously forbids the Agency's interpretation," *Barnhart*, 535 U.S. at 218, 122 S.Ct. 1265, the Court must conclude that the ATF's interpretation that deflagrating materials are explosives under 18 U.S.C. § 841(d) is permissible.

Notwithstanding what the Court has just concluded, even if this Court could conclude that the OCCA is silent or ambiguous on the issue of whether deflagrating materials fall within the scope of § 841(d), the Court would still have to conclude that the ATF's interpretation does not "exceed[ ] the bounds of the permissible." *Barnhart*, 535 U.S. at 218, 122 S.Ct. 1265. Operating as if silence and ambiguity are in play, because the ATF's interpretation of what constitutes an explosive under the OCCA is set forth in its December 22, 2000 letter, this Court must determine what level of deference it must give to the agency's interpretation of the Act contained in the letter. The Supreme Court has "recognized a very good indicator of delegation meriting *Chevron* treatment in express congressional authorizations to engage in the process of rulemaking or adjudication that produces regulations or rulings for which deference is claimed." *Mead*, 533 U.S. at 229, 121 S.Ct. 2164 (citations omitted). And, as this Court stated above, Congress clearly delegated to the Attorney General the power to "publish ... a list of ... additional explosives which he determines to be within the coverage of [the OCCA]." 18 U.S.C. § 841(d). However, while not dispositive of the deference issue, the *Mead* Court recognized that "the overwhelming number of [their] cases applying *Chevron* deference have reviewed the fruits of notice-and-comment rulemaking or formal adjudication." *Mead*, 533 U.S. at 230, 121 S.Ct. 2164 (citations omitted). Recognizing that the absence "of such formal process does not alone ... bar the application of *Chevron* [,]" the *Mead* Court declined to afford the United States Customs Service's classification rulings *Chevron* deference because not only was such a formal process lacking, but there were no "circumstances reasonably suggesting that Congress ever thought of classification rulings as deserving the deference claimed for them [t]here." *Mead*, 533 U.S. at 230–31, 121 S.Ct. 2164. This is not the case here, as Congress clearly mandated that the ATF publish a list of explosives

---

**4.** The *Encyclopedia of Explosives and Related Items* also discusses some of the distinctions between deflagration, detonation, and burning. In part, this reference indicates:

> Deflagrating explosives are substances which on being heated ... (or subjected to flame, sparks, shock, friction, etc.), while unconfined and in small quantities, ignite suddenly and burn much quicker than in ordinary combustions. The burning of deflagrating explosions usually proceeds rather violently and is accompanied by a flame (or sparks) and a hissing (or crackling) sound, but not with a sharp loud report as in the case of detonating explosives.

A.R. 8 at D 38.

annually. The Court also finds the ATF's 1971 regulations that were promulgated to implement the OCCA noteworthy on the issue of whether deflagrating materials are considered explosives under section 841(d). 27 C.F.R. § 55.202 explains that

[f]or purposes of this part, there are three classes of explosive materials. These classes, together with the description of explosive materials comprising each class, are as follows:

(a) High explosives. Explosive materials which can be caused to detonate by means of a blasting cap when unconfined. (For example, dynamite.)

(b) Low explosives. *Explosive materials which can be caused to deflagrate* when confined. (For example, black powder; safety fuses; igniters; igniter cords; fuse lighters; and 'special fireworks' defined as Class B explosives by U.S. Department of Transportation regulations in 49 C.F.R. Part 173.)

(c) Blasting agents. (For example, ammonium nitrate-fuel oil and certain water gels (see also § 55.11)).

*Id.* (emphasis added). Accordingly, this Court finds that the ATF's determination that a "chemical compound mixture, or device" that deflagrates "function[s] by explosion" and is thus regulated by the OCCA, should be accorded *Chevron* deference. This is because (1) the plain meaning of deflagration when the OCCA was enacted recognized deflagration as a type of explosion, (2) Congress explicitly delegated the power to the ATF to annually publish a list of explosives under the Act, and (3) the ATF's implementing regulation clearly indicates that explosive materials that deflagrate are considered low explosives.

■ However, even if this Court could conclude that the ATF's interpretation is not entitled to *Chevron* deference, but rather must be analyzed under *Skidmore*

and its progeny, the Court would still have to conclude that the ATF's interpretation must be given *Skidmore* deference. In *Christensen v. Harris County*, 529 U.S. 576, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000), the Supreme Court made it clear that "[i]nterpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference." *Id.* at 587, 120 S.Ct. 1655 (citations omitted). When reviewing an agency's interpretation of a statute that it has been charged by Congress with implementing, "courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position." *Mead,* 533 U.S. at 228, 121 S.Ct. 2164 (citations omitted). "The weight [accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id.* (quoting *Skidmore,* 323 U.S. at 140, 65 S.Ct. 161). Thus interpretations are " 'entitled to respect' under the Supreme Court's decision in *Skidmore* ... but only to the extent that those interpretations have the 'power to persuade[.]' " *Christensen,* 529 U.S. at 587, 120 S.Ct. 1655 (quoting *Skidmore,* 323 U.S. at 140, 65 S.Ct. 161). A review of the ATF's December 22, 2000 letter indicates that the ATF's interpretation that a "chemical compound mixture, or device" that deflagrates when ignited falls within 18 U.S.C. § 841(d)'s definition of an "explosive" has the "power to persuade." This letter, written by the Assistant Director of Firearms, Explosives and Arson, provides a detailed, in-depth explanation regarding

the ATF's position on why deflagrating materials come within the scope of § 841(d)'s definition of an "explosive." Aside from relying on its implementing regulations, the ATF notes that

> the statutory definition of "explosives" that is found at 18 U.S.C. § 841(d) specifically lists as examples of explosives such things as black powder, pellet powder, safety fuses, and igniters. Each of these is a compound, mixture, or device that is not designed to detonate, but is instead designed to deflagrate. That is, each of these materials is designed to burn very quickly (though with oxidation occurring more slowly than is the case during a detonation), with the burn front typically propagating through the burning material at less than the velocity of sound. The inclusion of examples of deflagrating materials in the statutory definition of explosives is a clear manifestation of Congress's intention that both detonating *and* deflagrating 'compounds, mixtures, and devices' are to be considered to 'function by explosion' and are, therefore, to be subject to the ... Act ....

A.R. 1 at p. 4 (emphasis in the original). In addition, the writer of this letter relies upon authoritative texts that indicate that deflagrating materials fall within the statutory definition of an "explosive." *Id.* at pp. 4–5. One such text is the *Introduction to the Technology of Explosives,* which explains that an explosion is

> a large-scale, noisy, rapid expansion of matter into a volume much greater than its original volume. This can be achieved by (1) bursting a vessel containing a pressurized fluid; (2) rapid heating of air and plasma by an electric

arc; (3) a *very fast burning reaction* [(deflagration)]; or (4) detonating an explosive material.

*Id.* at p. 4 (emphasis in the original) (quoting Paul W. Cooper & Stanley R. Kurowski, *Introduction to the Technology of Explosives* (A.R.6)).[5] Therefore, even if the ATF's interpretation that deflagrating materials fall within § 841(d)'s definition of "explosive" is not accorded *Chevron* deference, the ATF letter clearly reflects the "writer's thoroughness, logic, and expertness, [and] fit[s] with prior interpretations [*i.e.,* the implementing regulations]," *Mead,* 533 U.S. at 228, 121 S.Ct. 2164, that it has the "power to persuade." *Christensen,* 529 U.S. at 587, 120 S.Ct. 1655 (quoting *Skidmore,* 323 U.S. at 140, 65 S.Ct. 161).

**(2) Is the ATF's Determination that APCP is a Material that Deflagrates and is therefore an Explosive for Purposes of the Organized Crime Control Act Permissible?**

█ In *Ethyl Corp. v. EPA,* 541 F.2d 1 (D.C.Cir.), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976), the District of Columbia Circuit stated that a court should review scientific judgments of an agency "not as the chemist, biologist or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality." *Id.* at 36. This is because courts are ill-equipped to second-guess the expertise of agencies that are charged with making such scientific judgments. *See id.* As this Court commented above, APCP was placed on the ATF's first List of Explosives in 1971, *see* 36 Fed.Reg. 675 (Jan. 15, 1971), and

---

5. The Court notes that the December 22, 2000 letter also references the *Encyclopedia of Explosives and Related Items,* which this Court discussed above, and the *Chemistry of* *Pyrotechnics* (John A. Conkling, *Chemistry of Pyrotechnics* 2 (1985) (A.R.11)), for scientific authority that materials that deflagrate are explosives.

has remained on the list ever since, *see* 67 Fed.Reg. 20864 (Apr. 26, 2002). Courts have given such long standing agency interpretations "particular deference." *See Barnhart*, 535 U.S. at 220, 122 S.Ct. 1265 ("[T]his Court will normally accord particular deference to an agency interpretation of longstanding duration." (internal quotation marks omitted)); *Excel Mining*, 334 F.3d at 7 ("[W]e give weight to the fact that the agency that administers the statute ... has interpreted them the same way for more than 25 years.").

The ATF's December 22, 2000 letter explains that

[APCP] generally consists of an ammonium perchlorate oxidizer combined with a polymeric fuel binder. Upon ignition, and when it fulfills its intended function, APCP deflagrates. That is, APCP burns with oxidation taking place at a rate slower than the oxidation rate in a detonation (though at a rate much faster than is associated with typical burning) and with the burn front moving at less than the speed of sound ....

A.R. 1 at 5–6 (citing Seymour M. Kaye, *Encyclopedia of Explosives and Related Items*, PATR 2700, Volume 8, at 409 (U.S. Army Armament Research and Development Command, 1978) (A.R.10); *Chemistry of Pyrotechnics*). The ATF references several scientific texts that "have devised classification parameters that support a determination that APCP is an explosive." *Id.* at 6. The National Fire Protection Association's ("NFPA") *Fire Protection Handbook* includes "propellants" in its listing of "Types of Explosive Materials." *Id.* at 7 (citing National Fire Protection Association, *Fire Protection Handbook*, at 5–69 (16th ed. 1986) (A.R.12)). The ATF's letter notes that the NFPA

[d]efin[es a] 'propellant' as 'an explosive material which normally functions by deflagrating (burning) and [which] is used for propelling purposes' and categoriz[es] 'low explosives or propellants' as 'explosive materials,' ... [and] indicate[s] that low explosives/propellants '... are used primarily for propulsion purposes ... [and] normally function by burning rather than detonation, [but that] many propellants are susceptible to detonation.' ... [T]he NFPA [also] states that '[b]lack powder, smokeless powder, and solid rocket fuels fall into th[e] category [of low explosives/propellants] ....'

*Id.* Thus, this Court must conclude that the ATF's decision that APCP is a deflagrating explosive is permissible. Accordingly, for the aforementioned reasons, the Court will grant the defendant's summary judgment on Count 1 of the plaintiff's complaint.

**(B)** *Is the ATF's Determination that Sport Rocket Motors are Not "Propellant Actuated Devices" Permissible?*

In enacting the OCCA, Congress stated that the term "explosives" was not "intended to include propellant actuated devices or propellant actuated industrial tools used for their intended purpose." H.R.Rep. No. 91–1549 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4007, 4041. The ATF has exempted PADs from regulation, 27 C.F.R. § 55.141(a)(8), and in 1981 defined a PAD as "[a]ny tool or special mechanized device or gas generator system which is actuated by a propellant or which releases and directs work through a propellant charge." 27 C.F.R. § 55.11. As the plaintiffs point out,

[t]he 1981 ATF rulemaking did not create (and no other ATF rulemaking before or thereafter created) definitions for ... 'propellant actuated tools,' ...and the words or phrases, 'tool,' 'spe-

cialized mechanized device,' and 'gas generator system' as used in the definition of 'propellant actuated device' were not further defined or justified until ATF issued its letter of December 22, 2000 . . . .

Pls.' Mem. at 21. The plaintiffs assert that sport rocket motors qualify as PADs and therefore are exempt from the OCCA. A brief review of two letters issued by the ATF, one in 1994 and one in 2000, is a necessary predicate to addressing whether the ATF's interpretation that sport rocket motors are not PADs is permissible.

#### (1) *The ATF's April 20, 1994 Letter and Related Correspondence*

On April 20, 1994, James L, Brown, the Chief of the Explosives Division of the ATF, sent a letter to the president of AeroTech, Inc., the leading manufacturer of motors used in sport rockets, in response to an inquiry regarding how sport model rockets are regulated under federal law. Pls.' Mem. at 22; A.R. 20. The April 20 Letter began by stating that

> [d]uring the early 1970's when the [ATF] was assigned the responsibility of enforcing the Federal explosives laws, it was clear that we did not intend to regulate toy model rockets which did not constitute a public safety hazard. The exemption for model rocket motors, common fireworks, and propellant-actuated industrial tools was intended to cover explosive items that because of the small quantities involved, would not likely be a source of explosives for a bomb or be a hazard during storage situations. The explosives exempted were toy paper caps and other similar items. The largest model rockets that we were aware of were the Estes model 'D' type engine.

A.R. 20. Of particular significance to the plaintiffs, is the statement in the April 20 Letter that

> [t]he exemption at 27 CFR Part 55, section 141(a)(8) includes propellant-actuated 'devices.' The term 'device' is interpreted to mean a contrivance manufactured for a specific purpose. Under this definition, a fully assembled rocket motor would be exempt. However, the propellant, prior to assembly, would not be exempt.

*Id.* (emphasis added). The ATF went on to state that

> [t]he AeroTech products which have been classified by the Department of Transportation as a flammable solid 4.1 or as explosives 1.4c, which are within the 62.5 grams limit contained in NFPA 1122 and conform to the requirements of model rocket motors set forth in 16 CFR section 1500.85(a)(8)(ii), would meet ATF requirements for exemption under 27 CFR Part 55, section 141(a)(8).

*Id.* Upon receiving this letter, the president of AeroTech sent another letter on May 5, 1994, because he "needed further clarification" from the ATF, as "a literal interpretation of this [last] paragraph dictates that no existing AeroTech hobby rocket motor product meets all the requirements listed for exemption from the federal explosives law." *Id.* This was because "AeroTech's hobby rocket reload kits . . . do not meet the 16 CFR 1500.85(a)(8)(ii) (CPSC) construction . . . standards for model rocket motors that are made available for children . . . ." *Id.* The president of AeroTech went on to note that "[t]hey *do* meet the CPSC standards for labeling for hazardous products sold to adults . . . [and] in a letter to . . . Estes Industries . . . the [ ]ATF indicated that these products *would* be exempt from federal explosives regulations." *Id.* In response to AeroTech's May 5, 1994 inquiry, the Chief of the Explosives Division of the ATF issued another letter on June 20, 1994. A.R. 21. In that letter, the ATF

stated that "[w]e intended to exempt only those items that meet all of the requirements we listed in our letter to you dated April 20, 1994, including the requirements of the CPSC." *Id.* The letter went on to indicate that the ATF was coordinating with other agencies and that, after attending a rocket launch sponsored by Tripoli, they would "be better able to address [their] questions regarding how the assembly of high-power rockets that contain more than 4 ounces of propellant will be regulated under the Federal firearms laws .... " *Id.*

### (2) *December 22, 2000 ATF Letter*

In a December 22, 2000 letter, the ATF responded to an inquiry from the plaintiffs requesting a determination that sport rocket motors qualify as PADs. The ATF began its analysis by noting that to be classified as a PAD, a device has to meet the requirements of 27 C.F.R. § 55.11. The ATF noted that "[t]o ascertain the common, contemporary meanings of 'tool,' 'special mechanized device,' and 'gas generator system,' it is useful to look to Merriam–Webster's Collegiate Dictionary (Tenth Edition, 1997) (Webster's)." A.R. 1 at 11. The ATF stated:

> In doing so, we find that Webster's defines 'tool' in pertinent part as follows: 'a handheld device that aids in accomplishing a task ... [;] the cutting or shaping part in a machine or machine tool ... [;] a machine for shaping metal ....' Webster's defines the word 'device' as 'something ... contrived' and, more specifically, as 'a piece of equipment or a mechanism designed to perform a special function.' For a particular device to be a 'special mechanized device', Webster's appears to suggest, it would be necessary that it be both unique and of a mechanical nature. As to the term 'gas generator system,' Webster's defines 'generator' as 'an apparatus in which

vapor or gas is formed' and as 'a machine by which mechanical energy is changed into electrical energy.' Further, Webster's defines 'system' as 'a regularly interacting or interdependent group of items forming a unified whole[.]' Thus, Webster's may be read to suggest that 'gas generator system' is properly defined as 'a group of interacting or interdependent mechanical and/or electrical components that generates gas.'

*Id.* Using these definitions of items that constitute PADs, the ATF concluded that

> [t]he high-power sport rocket motor cannot be brought within the regulatory definition of propellant actuated device as a 'tool' because it is neither 'handheld' nor a complete 'device' and because it is not a metal-shaping machine or a part thereof. Further, it cannot be considered to be a 'special mechanized device' because, although clearly designed to serve a special purpose, it lacks the necessary indicia of a mechanized device. Indeed, the high-power sport rocket motor is in no way reminiscent of a 'mechanism'. Finally, because it has no interacting mechanical or electrical components, the high-power sport rocket motor cannot be deemed to be a gas generator system.

*Id.* at 12. The ATF found that

> the high-power sport rocket motor consists essentially of ammonium perchlorate composite propellant (APCP) encased by a cardboard, plastic, or metallic cylinder. Though also sometimes inclusive of a nozzle, retaining cap, delay grain and ejection charge, the high-power sport rocket motor is little more than propellant in a casing, incapable of performing its intended function until fully installed (along with an ignition system) within a sport rocket.

*Id.* at 11. Accordingly, the ATF concluded that

> in order to classify the sport rocket motor as a propellant actuated device, it would be necessary to suggest that the motor's cylindrical casing is a 'device' that is actuated by propellant. This simply is not a reasonable interpretation in light of the context in which the sport rocket motor is used. *Because the high-power sport rocket motor is, in essence, simply the propellant that actuates the high-power sport rocket, the motor itself cannot be construed to constitute a propellant actuated device.*

*Id.* at 12 (emphasis added).

Upon consideration of the ATF's April 20, 1994 and December 22, 2000 letters, it is clear that the ATF takes two different positions with respect to the applicability of the PAD exemption to model rockets. As discussed above, in its April 20, 1994 letter, the ATF stated that "[t]he exemption at 27 CFR Part 55, section 141(a)(8), includes propellant-actuated 'devices.' The term 'device' is interpreted to mean a contrivance manufactured for a specific purpose. Under this definition, a fully assembled rocket motor would be exempt." A.R. 20. However, in its December 22, 2000 letter, the ATF stated that "[b]ecause the high-power sport rocket motor is, in essence, simply the propellant that actuates the high-power sport rocket, the motor itself cannot be construed to constitute a propellant actuated device." A.R. 1 at 12. Recognizing the glaring contradiction of these two interpretations, the ATF states that the April 20, 1994 and June 20, 1994 letters were "inartfully drafted." *Id.* The ATF asserts that its December 22, 2000 letter should be given deference because it is an interpretative rule. Defen-

dant's Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Summary Judgment ("Def.'s Opp'n") at 15–17. It is obvious why the ATF wishes to classify its December 22, 2000 pronouncement that sport rocket motors are not PADs as a interpretative rule, rather than a legislative rule, because doing so exempts it from engaging in notice and comment procedures.[6]

In *Air Transport Association of America, Inc. v. FAA,* 291 F.3d 49 (D.C.Cir. 2002), the District of Columbia Circuit stated that

> [t]he APA requires federal agencies to publish '[g]eneral notice of proposed rulemaking' in the Federal Register, 5 U.S.C. § 553(b), and 'give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments,' 5 U.S.C. [§ ] 553(c). Section 553, however, exempts 'interpretative rules' and 'general statements of policy' from notice and comment procedures. 5 U.S.C. § 553(b)(3)(A). Nonetheless, it is well established that an agency may not label a substantive change to a rule an interpretation simply to avoid the notice and comment requirements. *See Appalachian Power Co. v. EPA,* 208 F.3d 1015, 1024 (D.C.Cir.2000).

291 F.3d at 55. However, even if the December 22, 2000 pronouncement can be considered an interpretative rule, it may still be subject to notice-and-comment rulemaking. In *Air Transport Association,* the Circuit Court also stated that " '[r]ulemaking,' as defined in the APA, includes not only the agency's formulation, but also its modification, of a rule. As the United States Supreme Court has noted,

---

**6.** 18 U.S.C. § 847 requires the Attorney General to "give reasonable public notice, and afford to interested parties opportunity for hearing, prior to prescribing such rules and regulations."

APA rulemaking is required if an interpre-tation 'adopt[s] a new position inconsistent with ... existing regulations.'" *Id.* at 56 (citations omitted). *Alaska Professional Hunters Association v. FAA*, 177 F.3d 1030 (D.C.Cir.1999), illustrates this point. In that case,

> Alaskan guides who transport their cus-tomers to hunting and fishing sites by airplane challenged the FAA's require-ment (imposed via a Notice to Opera-tors) that they comply with FAA regula-tions applicable to commercial pilots. The Notice, promulgated without notice and comment, reversed the FAA's thir-ty-year interpretation that had exempt-ed the guides.

*Air Transport Association*, 291 F.3d at 56–57 (citing *Alaska Professional Hunters*, 177 F.3d at 1033). Relying primarily on earlier precedent in *Paralyzed Veterans of America v. D.C. Arena L.P.*, 117 F.3d 579 (D.C.Cir.1997), the *Alaska Professional Hunters* Court stated:

> 'Once an agency gives its regulation an interpretation, it can only change that interpretation as it would formally modi-fy the regulation itself: through the pro-cess of notice and comment rulemaking.' [In *Paralyzed Veterans* w]e ... ex-plained why an agency has less leeway in its choice of method of changing its interpretation of its regulations than in altering its construction of a statute. 'Rule making,' as defined in the APA, includes not only the agency's process of formulating a rule, but also the agency's process of modifying a rule. When an agency has given its regulation a defini-tive interpretation, and later significant-ly revises that interpretation, the agency has in effect amended its rule, some-thing it may not accomplish without no-

tice and comment. *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94–95 (D.C.Cir. 1997), is to the same effect: a modifica-tion of an interpretative rule construing an agency's substantive regulation will, we said, 'likely require a notice and com-ment procedure.'

*Alaska Professional*, 177 F.3d at 1033–34 (internal citations omitted).

The Court finds that the variance be-tween the pronouncements in the ATF's April 20, 1994 and December 22, 2000 let-ters, with respect to the applicability of the PAD exemption to sport model rockets, squarely fits into the scenario discussed by the District of Columbia Circuit in *Alaska Professional.* Here too, an agency sought to reverse the applicability of an exemp-tion without notice and comment. Thus, before the ATF could altered its earlier interpretation of the applicability of the PAD exemption, it was required to under-take notice-and-comment rulemaking as required by the APA and the OCCA. Be-cause the ATF failed to do so, the Court concludes that its December 22, 2000 pro-nouncement regarding the applicability of the PAD exemption to sport model rockets was not in compliance with the OCCA and the APA.[7]

**(C)** ***Did the ATF's Classification of Rocket–Motor Reload Kits Which Enables the Construction of Rocket Motors Containing More Than 62.5 Grams of Propellant Require Notice and Comment?***

The plaintiffs assert in counts four and five of their First Amended Complaint that several letters that the ATF wrote con-cerning an exemption under the OCCA for rocket motors containing no more than 62.5 grams of APCP constituted rulemak-

7. Because the Court finds that the ATF's pro-nouncement regarding the applicability of the PAD exemption violates the OCCA and APA's notice and comment requirement, it need not address whether sport model rockets are in fact PADs.

ing and thus required public notice and the opportunity to comment. Am. Compl. at ¶¶ 48–53. As this Court discussed in its June 24, 2002 Memorandum Opinion,

> according to the amended complaint, ATF, in several letters written to a manufacturer of APCP in 1994, for the first time indicated that only sport rocket motors that use 62.5 grams or less of APCP as a propellant were exempt from regulation under the [Organized Crime Control Act]. Then on October 15, 1999, after several meetings that had been conducted earlier that year between plaintiffs' representatives and ATF, 'ATF stated that if more than 62.5 grams of APCP were used in a rocket motor, ATF had the authority under the [Organized Crime Control Act] (and the implementing regulations at 27 C.F.R. Part 55) to regulate the purchase and storage of material.' This position was again reiterated by ATF in a letter written to plaintiffs on December 22, 2000.

*Tripoli Rocketry*, Civ. A. No. 00–273, at 20 (citing Am. Compl. ¶¶ 31, 34). This Court concluded that "the ATF's pronouncements concerning the non-exempt status of sport rocket motors that use more than 62.5 grams of APCP amounted to rulemaking under [18 U.S.C.] § 847." *Id.* Because the ATF failed to comply with the OCCA's section 847 notice and comment procedure, the plaintiffs seek to have this Court set aside this rulemaking. However, since the parties' summary judgment motions were filed, the ATF advised the Court that it had initiated rulemaking regarding the 62.5 gram exemption for APCP. *See* Defendant's Notice of Commencement of Rulemaking on 62.5 Gram Exemption for APCP and Suggestion of Evolving Mootness of Counts Four and Five. And, on January 29, 2003, the defendant published a notice of proposed rulemaking in the Federal Register soliciting comments from the public concerning an exemption for

sport model rockets that contain no more than 62.5 grams of total propellant. *See* 68 Fed.Reg. 4406-01. On June 9, 2003, NAR filed its comments with the ATF in response to the notice of proposed rulemaking. *See* Plaintiffs' Notice of Filing Comments in Response to Defendant's Proposed Rulemaking on a 62.5 Gram Exemption for APCP. Acknowledging that the "process will necessarily take several months," the ATF asserts that "the Court should defer consideration and resolution of the parties cross-motions for summary judgment on Counts Four and Five indefinitely and await the outcome of the rulemaking." Defendant's Notice of Commencement of Rulemaking on 62.5 Gram Exemption for APCP and Suggestion of Evolving Mootness of Counts Four and Five at 4. The ATF's actions comply with the alternative relief requested by the plaintiffs in their First Amended Complaint. *See* Am. Compl. ¶ 60. Accordingly, because the defendant has undertaken notice-and-comment rulemaking concerning the 62.5 gram exemption issue for APCP, the Court will hold in abeyance a ruling on counts four and five of the First Amended Complaint until the completion of the rulemaking process.

## IV. *Conclusion*

For the reasons set forth above, this Court will grant summary judgment to the ATF on the issue of whether APCP is a deflagrating explosive. In addition, the Court finds that the ATF's pronouncement that sport rocket motors are not PADs is invalid because it was made without compliance with the notice-and-comment rulemaking procedures of the OCCA and the APA. Finally, the Court will hold in abeyance a ruling on counts four and five of the First Amended Complaint pending the completion of the notice-and-comment rulemaking process that has been initiated

by the ATF concerning the 62.5 gram exemption issue for APCP.[8]

8. An Order consistent with the Court's ruling accompanies this Memorandum Opinion.